The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. You may be seated. Good morning, Judge Shedd. Good morning. Good morning. Good morning, counsel. Good morning. Good to have you all here. We look forward to the arguments. The first case is Hook v. Colvin, Mr. Mays. Pleased to hear from you, sir. Good morning, Your Honor. May it please the Court. My client, Manly Hook, worked consistently for many years and through 2008. And in 2009, or actually prior to that, leading up to that, he progressively developed a problem with his hip that led him to seek treatment with a specialist in 2009, Dr. Vaughn Massey, an orthopedic specialist in Aiken, South Carolina. And Dr. Massey determined through x-rays and other examination that Mr. Hook had vascular necrosis of his hip and severe degenerative arthritis on the right side. And as a result of that, Mr. Hook proceeded to The worst hip was on the right or the left? It was on the right. They both were bad though, right? Right. He did have arthritis on the left, but it was worse on the right. And I believe the vascular necrosis was primarily on the right. So he, of course, as a result of that, he did go ahead and file his social security disability application. I represented him in his initial hearing before a Judge Martin, an administrative law judge. And Judge Martin approved the case. But the Appeals Council, which they sometimes, somewhat rarely do, but they did initiate, in this case, an own motion review, and they decided to look at the decision he had issued and determined that it needed to be reexamined. When the case was sent back, it was sent back to a different judge. A little bit unusual. I believe that was because Social Security temporarily had an Augusta office. Yes. Let me ask the question. Sure. What error are you claiming? We are claiming that the administrative law judge at the second hearing did not properly assess both the treating opinion and the opinion of the consultative examiner that that judge sent the claimant to for a further evaluation of his condition. So he just, wait, he just didn't properly weigh the evidence in front of him? Is that your claim? Well, no. It's more specific than that. He committed error in the manner in which he evaluated the opinions. The federal regulations are very specific in how treating and evaluating opinions must be weighed and the basis for that. But you just said in how they must be weighed. Right. I'm asking. Your claim is that the administrative law judge didn't properly weigh the conflicting evidence in front of him? Well, my claim would be more specifically that there really wasn't conflicting evidence in terms of a sitting restriction. All opinions provided both by the consultative examiner and the treating physician was that there were sitting restrictions, and he found no sitting restriction and did not provide an explanation as to why he did not find a sitting restriction. So that is really the issue here, at least one of the primary issues, is that both the treating doctor and the consultative examining doctor both indicated that Mr. Hook would have problems sitting for sustained periods of time. The standard that you're arguing here today, is that based on the 1991 change in the regulations or is it our preexisting law for the treating physician? It's the 1991 regulation, Your Honor, for sure. But now to the extent that the Fourth Circuit had previously put forth authority on how to evaluate opinions, I believe that authority still guides to the extent it doesn't contradict or conflict with any regulations. But the regulations certainly did clarify and make it very specific in terms of, you know, how to evaluate both treating and consultative opinions. Are you relying on some pre-'91 case that doesn't conflict with the change in the 1991 regulations? No, Your Honor, I don't believe that's even necessary. I do cite some cases in my brief that, you know, treating physician is supposed to be given controlling weight if it's not substantially contradicted. But that's essentially what the federal regulations found. And in this case here, you know, my argument is that the judge doesn't, when you go into the RFC evaluation, the functional capacity evaluation, he doesn't even really get into explaining or, you know, he doesn't explain his sitting, his finding that there is no sitting restriction. This is a man who has vascular necrosis whose treating doctor says he needs a hip replacement. And the judge found no restriction on his ability to sit at all, even though the consultative doctor said that he could sit for 60 minutes and would need to stand. And the treating doctor said that he would need to shift positions frequently and would need to elevate his legs every 30 minutes for about 15 minutes or so. So, you know, those kind of restrictions, certainly the ones indicated by the treating doctor, would not be compatible with sedentary work, I would submit. But regardless, I don't really have to prove that or show that. I just have to convince the court that the judge did not properly consider restrictions that were. . . You're talking about the administrative law judge. Right. The administrative law judge did not consider, you know, the restrictions that were indicated in evidence and provide an explanation. On the sitting restriction. That's right. In the second hearing, the second administrative law judge. That's right. You're not claiming any error about the first administrative law judge. No, Your Honor. We were satisfied with the first finding that he was disabled. Okay. You're not claiming any error with respect to the first one? Not in this appeal, Your Honor. It's just the second one, and it's all focused on this sitting restriction. It's focused on the sitting primarily because that is the doctor's opinions. You say primarily now, but is that different than you said before? Well, you know, I just said primarily, Your Honor, because actually like if you look at Dr. Massey's opinion, he actually indicated that Mr. Hook would miss six to ten days a month from work due to pain. And so that is a separate restriction from the sitting that would preclude work. And so I think, you know, when you get into that, there are other factors here in the opinion that would preclude work. But primarily the argument is on the judge's complete failure, in my opinion, to evaluate the sitting, the evidence of sitting. You're saying that was undisputed? Well, it's undisputed in the fact that there is no treating or examining opinion from any source, medical source, saying that my client can sit in an unrestricted fashion as found by the ALJ. Does the fact that your client didn't always mention this hip leg problem to a doctor and the fact that he never pursued any other treatment other than over-the-counter pain medication, does that play into the calculus? Your Honor, that is a factor for the court to consider. I addressed those arguments, those points in my brief. And our argument is that when the hip replacement surgery was initially proposed by the treating specialist, at that point Mr. Hook did not have any medical coverage. There's no way he could have afforded to have it done. And he did subsequently, a few years later in 2012, obtain Medicaid coverage. That's indicated in the record at one point. But at that point, at the point that there was discussion going on about a hip replacement, he would have had no means to have that done. And the doctor and Dr. Massey in his record. He had no means. He had no financial means. No financial means. He couldn't afford the hip replacement. But I thought also he didn't want to have it anyway. Well, at the administrative hearing, that's correct. At the administrative hearing he indicated that he had been hearing bad things about the hip replacement. And I pointed out that this was around the time that there was this big hip replacement recall going on and a lot of litigation surrounding that and a lot of TV commercials and things. So I'll admit that's somewhat speculative. But he did say in the hearing that he was hearing a lot of things about hip replacements not going well and things. And that was something he was considering. But at the time that the surgery was actually proposed, he did not have medical coverage at that time. The underlying point is Dr. Massey specifically said in the records that there was really nothing else to be done other than this hip replacement, that there was really no other means to help him here. And at that point, you know, that's really all he could look at doing. Was Dr. Massey the treating physician? Yes, Your Honor. He's the only treating physician in the case? He's the only treating physician specifically for the hip problem, yeah. And he did go to a community medical clinic, which is like a free clinic. And, you know, there are some notes in those records at times saying he's not having problems and things. But I think the court needs to understand that that's a free clinic that does not treat orthopedic problems. They're treating chronic conditions like hypertension. Is Massey an orthopedist? Yes. He was an orthopedic surgeon? Yes, that's correct. Von Massey is an orthopedic surgeon. Is he the only one in the case? He's the only treating doctor in the case. No, is he the only orthopedist, qualified orthopedic surgeon from whom there's evidence in this case? Yes, Your Honor. Yes, they did send him to a consultative examiner, Dr. Garday. And, you know, Dr. Garday provided an assessment as well. But Dr. Garday is not an orthopedic specialist. It's best to understand it. I think Dr. Garday is a general practitioner, primary care doctor. But so those are the opinions. Did he contradict Massey at all? There was contradiction. I mean, they're not exactly the same. There was something, wasn't there, that the second LJ didn't credit Massey on? Yes, the decision that was a denial, he actually rejected. Like I said, Dr. Massey provided a number of restrictions that that judge didn't accept, including the missing six to ten days from work, the sitting restriction. And, you know, so he rejected all of that. And in terms of Dr. Garday, basically he... Did he credit this fellow that was not the orthopedist? He gave Dr. Garday great weight. He said he assigned the opinion great weight. And he specifically said in the decision that that opinion was given great weight because the explanation for the restrictions were well explained by the doctor and that those restrictions were supported by the medical evidence. Despite that, the judge did not even mention in the decision or acknowledge in the decision that Dr. Garday had provided the sit-stand option, saying that the claimant could only stand for ten minutes and then could sit for 60 minutes and could only walk for a total of one hour in a day, which isn't consistent with the full range of sedentary work either. Does that term, great weight, mean the same thing to you as controlling weight? Your Honor, I don't believe that. I'll have to admit I don't believe the courts have really viewed great weight as controlling weight. To me, I've always sort of assumed that if the judge is saying they're giving it great weight, unless they go back and say, but I'm rejecting this part of the opinion, then essentially they're giving it controlling weight. Because under the regulations, they have to provide substantial reasons and give substantial evidence why they're rejecting an opinion that's provided with specific assessments like that. And so if you say I'm giving it great weight and you don't go back and say, but I don't accept this part of it because, then you're either giving it controlling weight or you're not giving it controlling weight, but then your opinion is not supported, substantially supported, because you don't have a rationale to reject any part of the opinion. So, yes. Judge Shea. Question. Is your argument that the term great weight in a decision is the same as controlling weight? You're not making that argument, are you? Your Honor, my point, the point I was trying to make. No, I want you to answer that for me first. Do you think great weight means controlling weight? No, Your Honor. I do not. Let me ask this of you. Is your error based on how the ALJ treated the evidence in front of him? I called it weighing, but treated the evidence in front of him. Do you make any separate argument or any argument about the question asked of the vocational rehabilitation expert? The hypothetical question. Do you want to make any argument about that or not? I'm just asking that question of you. Right. Well, I guess, I mean, the hypothetical question ties into the argument, because my argument is that the judge didn't explain why he rejected these sitting restrictions. And so, do I specifically go with you? Are you making any specific claim of error about the hypothetical question? Your Honor, it's implied in the argument I make about the restrictions. I do specifically. Let me ask you again. Are you making a freestanding claim of error about the hypothetical question? I'm not trying to pin you in. I'm just asking you to understand your argument. I did not make it a separate argument. No, Your Honor. I did not make it a separate argument. But do you think that just folds into the whole how the evidence total was treated? I think it folds into my argument about the RFC being not properly evaluated. Yes, Your Honor.  And I think I did cite in my brief about the hypothetical, you know, question has to fully represent the restrictions, you know, that are indicated by the evidence. It looks like my time's up, so. Well, you have some time reserved. Okay. The red light's on you. You have a few minutes reserved. I think five minutes. Yes. We'll get back to you here in a minute. Okay. Thank you, Your Honor. Ms. Quick, three minutes. I'm sorry. Ms. Quick, nice to have you here. Thank you. May it please the Court? My name is Jillian Quick, and I represent the Commissioner of Social Security. As Your Honors are aware, substantial evidence is not a large amount of evidence. It is more than a mere scintilla and less than a preponderance. Here, substantial evidence supports the ALJ's decision that plaintiff's hip pain was not so severe and unremitting that he could not do even sedentary work, a sitting job. His only treatment during the entire four-and-a-half-year period was ibuprofen prescribed by a nurse practitioner. When he returned to the nurse practitioner, he reported that the ibuprofen helped. When he returned again three more times to the nurse practitioner, he reported no further complaints. He did not seek any further pain management. He did not go to the ER or the hospital seeking further pain medication, even when he was not covered by medical insurance. He did not undergo surgery or injections, as was recommended by Dr. Nicholson. And even when he had medical coverage for at least 17 months, he did not even see a specialist to follow up about his hip. He had no complaints to any of his treating sources for the two-and-a-half years prior to the date of the ALJ's decision. Doctors Massey, Gard, and the state agency physicians, Drs. Kukla and Vansluten, said that Plaintiff could sit for six hours. Plaintiff admitted at the hearing that he could sit for one to two hours and that at that point he would merely have to reposition himself. He stated that he would have only some pain from prolonged sitting. The ALJ accounted for Plaintiff's hip pain by significantly restricting his postural activities, his standing, and his need to walk. Ultimately, substantial evidence supports the ALJ's decision. We just heard Plaintiff's argument about Dr. Massey. As you're aware, the responsibility for determining a claimant's residual functional capacity lies with the ALJ after he has reviewed the evidence. Plaintiff saw Dr. Massey one time. Dr. Massey said that Plaintiff could sit for six hours and that he could lift 20 pounds occasionally and 10 pounds frequently. The portion that is in dispute here essentially is the amount that Plaintiff would miss work, his fatigue, and his ability to concentrate. Here, the ALJ reasonably concluded that the evidence did not demonstrate such disabling pain that Plaintiff could do sedentary work or he did not pursue aggressive treatment. He did not complain to his treating sources for two and a half years and where he admitted that he could sit for one to two hours with only some pain from prolonged sitting. No other physician found Plaintiff as limited as Dr. Massey, as this one-time provider, Dr. Massey. Therefore, Your Honors... Is he the only orthopedic surgeon that looked at it? I believe that's right. Dr. Nicholson, I believe, is a pain management specialist. Dr. Massey did send Plaintiff to other physicians. He did tell Plaintiff to see two other physicians during his treatment. So, it's not clear that he would have done the surgery since he told him to see two other physicians and Plaintiff did not follow up with that. Those two other consulting physicians, as I understand it, gave a similar conclusion that Dr. McCarty gave. Is that correct? I'm sorry. I didn't understand. I didn't hear you. The two other non-examining consulted physicians, did they not reach the same conclusion that Dr. McCarty did? They were similar. Their conclusions were that Plaintiff could actually lift more, like Dr. Massey said. But Dr. Gard found that Plaintiff could lift less. And Dr. Gard did also... I think he had different restrictions for postural activities and maybe even some... I think it was environmental restrictions. And also that Plaintiff would need to sit for an hour and then he would need to stand. So, those would be the, I think, primary differences. And the ALJ did give great weight to Dr. Gard's opinion and he gave some weight to the state agency physicians. Who diagnosed the avascular necrosis? That was, I believe, Dr. Nicholson. But Dr. Gard also... Dr. Massey? I mean, Massey, yes. Dr. Massey did. Dr. Massey and I believe also Dr... Well, no, Dr. Nicholson said only, I think, it was degenerative. Would you agree that if you have avascular necrosis, the best qualified doctor you can go to is the orthopedic surgeon? Your Honor, that is right. That a specialist, and that does play a role in evaluating the opinion evidence. But that is not the only factor that's considered. And here, considering that... He's the only one that we've seen here that falls in that category, Dr. Massey. Right, and he saw a plaintiff... That's correct, yes. He saw a plaintiff one time. And the other doctors are still certainly qualified to render opinions. And even the state agency physicians, they're considered highly qualified and experts under Social Security's rules. And with respect to Dr. Gard, he said that plaintiff would need to stand after sitting each hour, as plaintiff told Dr. Gard at that examination. However, appellant did personally testify under oath to a greater ability to sit. He said that he could sit for maybe two hours and that he would merely have to reposition himself and he would have only some pain with prolonged sitting. It's well established that a person does not need to be pain-free to be found not disabled. Many individuals have some level of pain. The question is whether this is disabling, unremitting type of pain. Let me ask you a question. You're making an argument right now, but I'm not so much interested in your argument you make now. I'm interested in what you think was the strongest evidence of disability presented to the ALJ, the strongest evidence, it might be Massey testimony, and then how the ALJ handled that or dismissed it or discounted it. Because this is a question about you arguing what the evidence is and doctor's qualifications, but the question is how the ALJ handled it. What is the strongest evidence of disability and a piece or two, and then how did the ALJ deal with that? Sure, Your Honor. Probably the strongest piece of evidence would be the one-time provider, Dr. Massey, as you mentioned. That would be probably his strongest evidence, and the fact that he did say that he would need a hip replacement. That shows a significant impairment. However, the ALJ fully recognized that he had a significant impairment and found that he was limited to a restricted range of sedentary work. The ALJ fully evaluated Dr. Massey's opinion in his decision, as was required by the regulations, and reasonably concluded that in light of the entire record, the plaintiff was not precluded from sedentary work,  and that was his job to determine the claimant's RFC after reviewing the entire record. It is not reserved to a doctor to make that determination. Did the ALJ find there was still a range of activity based on Dr. Massey's testimony, or did he look at other doctors' testimony to establish, I don't want to say refute necessarily, but to outweigh the evidence in the record of that disability? Yes, Your Honor. He reviewed the other doctors. He did give moderate weight to the state agency physician's opinions, and he gave great weight to Dr. Gard's opinion, and they were all saying that the plaintiff could do much more than Dr. Massey. And even Dr. Van Sluyten, the second state agency physician, specifically considered Dr. Massey's treatment note and Dr. Massey's opinion, and still said that the plaintiff could do sedentary work, unlike Dr. Massey, who said that the plaintiff would miss many days of work for someone who did not even seek treatment, essentially, for at least two and a half years, and even when he had medical coverage. So the ALJ rejected Dr. Massey? He gave the doctor's opinion little weight. Although he was the best doctor from a standpoint of qualifications in the record. He was the only orthopedic surgeon, and he was the only treated physician. Your Honor, that's not necessarily accurate. Well, was there another treated physician? Your Honor, he saw a plaintiff one time as the Dr. Gard. You all characterized him as a treated physician.  Was there a second treating physician? Was there a second treating physician? No, Your Honor. Was there a second orthopedic surgeon? No, Your Honor. There we go. All right. Now go ahead. Okay, and Your Honor, there is no requirement that the ALJ give any particular weight just based on specialization. And, Your Honor, with respect to the first ALJ decision, that was vacated by the Appeals Council as in a normal function of the Appeals Council's job is to review decisions from the ALJ, whether they are favorable. He's not complaining about that. Okay. Well, then, I don't need to go there. No, I have a question for you. I can't see the clock, Judge King, if there's still time. You go right ahead. I'll ask. It seems to me you've heard Judge King's question. And what you have to at least argue to us, at least I would like your answer, he points out that the only orthopedist and the treating physician came to a different result or resolution than did the ALJ. Now, I think you need to tell us why that ALJ decision should stand, although he did not go along with the sole treating physician who was the only orthopedist in this case. Sure. And hear what you say about that. Yes. Yes, Your Honor, he saw this doctor on one occasion, and this doctor gave opinions about how much he would miss work. He was opining about the pain that plaintiff would have, that he would have such unremitting pain that plaintiff would miss work for 10 days. That's half a month. And that his ability to concentrate would be disturbed, and there's no evidence of problems concentrating in the record, that he would have tremendous fatigue. Do you know how much pain he had when he had avascular necrosis? Your Honor, based on the amount of treatment that he sought, his pain was not so unremitting that he couldn't do even a sedentary job. He did not even bother to pursue a hip replacement. In his testimony about him being scared, even Dr. Massey said that plaintiff would improve with a hip replacement. There was no doctor who he saw who said that a hip replacement would not be a good idea. He never bothered to follow up, even with Dr. Nicholson. Well, he didn't have insurance coverage there for a long time. Yes, Your Honor. He didn't have the means. Yes. Is that, you got some explanation for that, how he could have gotten it paid for? Yes, Your Honor, that's correct. What's the explanation, how he could have paid for it? No, you're exactly right that he did not have medical coverage for the first, when Dr. Massey first recommended the surgery. So at the time it was recommended, he didn't have the means to do it. It was impossible. Yes, that's correct. I would say that's right. It's impossible for him to have it. Yes. At the same time, he did not pursue significant medication. He didn't go to the ER. People who don't have money can still go to the emergency room. Well, they don't do hip replacements in the emergency room. That's right, Your Honor. But he didn't even try to get more significant medication. He followed up with a nurse practitioner a year and a half after he saw Dr. Massey. This is the first time he complained about his hip to anyone, to any treating source. And the nurse practitioner prescribed ibuprofen when he returned four months later. Ibuprofen is pretty good for pain. Some doctors, they double up the recommendation on the package probably and say that's a prescription, basically, if you take an extra ibuprofen or two. Right. And, Your Honor, he said that it helped his musculoskeletal pain. He specifically said that. Thereafter, he said he had no complaints. So the fact that he did need a hip replacement doesn't necessarily preclude him from sedentary work. And then the fact that he didn't pursue it when he had medical coverage for at least 17 months demonstrates that he did not have such unremitting pain. Just merely needing a hip replacement is not necessarily disabling or having a certain diagnosis. There has to be. But I think you have to concede that needing a hip replacement, even though you can't or don't get it replaced, could be disabling. You have to concede that, don't you? Yes, Your Honor. I agree that it could be, but it's not this case. This is not that case where he did pursue only ibuprofen. He didn't even bother to see a specialist to follow up about a hip replacement during the entire time that he had medical coverage. Have you got a better over-the-counter pain medication for him? Your Honor, he said that pain medication. Ibuprofen, is that one that's better than that, that he can afford to get? He didn't have insurance. You already said that. Right. Right, Your Honor. What should he have been taking instead of ibuprofen? Right. He said that it worked, that it helped him. Well, you said it doesn't. You said it indicates that he didn't have any pain, that he's willing to treat it with ibuprofen as if it doesn't mean anything. Your Honor, the issue isn't whether he had pain. Many people have some degree of pain. It's whether it's disabling. And in this case, it's not disabling. He said that the ibuprofen worked, and he had no further complaints to any medical source, any of his medical sources, for the remaining two-and-a-half-year period. Yes, Your Honor. You started your argument by talking about standard of proof or burden of proof. That really is your argument, isn't it, that there might be disagreement, but that the standard or review is so easily met that you meet it in this case. That really is your argument, isn't it? Your Honor, my time is up. No, you go ahead and answer it. Okay. Yes. As long as he asks questions, you answer them. Yes, that is exactly the argument. We're talking about substantial evidence. This is not where the court reweighs the entirety of the record and comes to a whole new conclusion. The ALJ deserves deference, and that is how the standard is set up. But the ALJ, he does deserve deference, but he has to explain things, right? Yes. And the lawyer here on the other side, Mr. Mays, says he didn't explain sufficiently, as I understand it, that the ALJ didn't sufficiently explain what we're dealing with here. Do you agree that he does have to explain? He does have to explain, and he did. And the court, the district court or this court, we're not entitled, and you as counsel aren't entitled to fix it for him. Right. Under administrative law principles, the ALJ has to do it. Right. Do you agree with that? Yes, Your Honor. Spring court case on that. Right. At the same time, there is harmless error, and where you have plaintiff's testimony. Harmless error? Well, I'm not sure that applies. That's what I was getting at. I think ALJ has to explain. Well, Your Honor, he did explain. I'm not sure there is a harmless error doctrine in these administrative law proceedings where if the ALJ didn't sufficiently explain the sitting restriction or the problems with the hip and how he was disregarding Dr. Massey, for example, that we can fix it or you can fix it by arguing harmless error. Your Honor, his hip, I'm sorry. An ALJ is supposed to explain it sufficiently. Right. To be entitled to the deference that they're entitled to. Right. Yes. Your Honor, he did explain it. Well, we don't argue with that, that your people are entitled to deference. They are. I mean, you've got to run this program. A court shouldn't be doing it. The harmless error comment by the district judge was in error, wasn't it? He said something to the effect if the district court incorrectly found if the ALJ committed error, such error would be harmless. I mean, that's wrong, isn't it? No, your Honor, that is not wrong. Harmless error does apply. Shinseki versus Sanders, which cites Nelson versus I think it's Astru, which is a Social Security case, harmless error does apply in the Social Security context. And so here, even if this court were concerned about how much he would stand, you know, if he had to stand and then sit for an hour and then reposition himself or stand, the plaintiff testified that he could sit for one to two hours. The question wasn't designed to be against you. It was sort of favorable. I don't know why you're running off reservation with your answer. Okay, I'm sorry. Yes, the commissioner's position is that there's no error. Okay. Is that shared? Anything else? Thank you. Thank you. Thank you, Ms. Quick. Thank you. Good to have you here. Mr. Mays. Thank you, Your Honor. All right. I reserve three minutes, so I'm going to keep this pretty quick and just run through a few things to rebut a few things she said. First of all, regarding the harmless error argument that she finished up there with or that the court was asking about, I don't think that there's any argument that that could apply in this case because Social Security ruling, the Social Security commissioner concedes through Social Security ruling 96-9P that the specifics of a sit-stand option, the specific duration, the length of time needed to sit and stand and that sort of thing, plus the impact of other non-exertional impairments, are critical to the determination. The commissioner concedes that there's erosion of the occupational base in these cases in many instances, and whether there's erosion of the base or not depends on the very specific circumstances of each case with a sit-stand option. In this case, there's no vocational opinion evidence at all that standing for ten minutes and being able to sit for 60, plus all these other non-exertional restrictions the judge found, like not being able to kneel, not being able to crouch, not being able to drive, environmental restrictions. There's no opinion anywhere saying that all those restrictions together would result in these jobs that were cited in this case or any other jobs. You have to have a vocational expert say what the impact of all that together would be. So to argue it's harmless error is just ignore the fact that the specifics of the case are going to demand vocational testimony. I did want to address that. I'm sorry, Judge. But that argument is not right, I don't think, because you make an argument that there can't be harmless error. We've gotten off on harmless error. You can have harmless error, as I read the law in these cases. You're making a claim that it's so specific in every case you can have it. I don't know if you have to make that argument in this case or not, because if you could glean it from the record and you don't show prejudice under harmless error, a claimant wouldn't win. So I don't know why you want to go there. Let me ask this of you. What exactly do you want? I know you want a remand for a specific question to be asked, for a further explanation, for you to win the case. What is it that you want specifically? I think the court should find that there's no substantial evidence that was cited by the administrative law judge to rebut the treating of physicians' opinion or remand for payment of benefits based on his opinion. But on the alternative, I certainly think that there should be clarification. First of all, the administrative judge never even acknowledged Dr. Gard's sitting restriction on the sit-stand option. So the court has no evidence that the judge is even aware that that restriction was provided by Dr. Gard. The judge never mentions it in the decision. So it's entirely speculative to say that the judge even knew that that was part of the opinion. So yes, I believe that if it's not remanded for payment of benefits, then the case needs to be remanded for a proper evaluation, both the consultative and the treating opinion. Well, you say in your brief that you wanted, this is at page 34, you wanted to be remanded for further administrative proceedings to provide a proper RFC explanation. So you're asking for something different this morning? No, Your Honor. I mean, I believe that the court could find that the opinion is well supported, not substantially contradicted, remand for payment of benefits based on that opinion. But I did ask in my brief for remand for clarification on the issues I raised in the brief. That's what you said a while ago. That's your alternative request? Yes, Your Honor. You like to win outright, but if you can't, you want another bite at the apple. Is that what you're asking for? Yeah, Your Honor. I think the claimant is entitled to that in this case. You know, the system is required to follow these regulations and rules, and the client's entitled to a fair shake in terms of the opinions that are provided supporting his allegations. Again, if I could make one final point, that is the attorney for the appellee in this case, you know, emphasized the things he said in the hearing. He also said in his administrative hearing that there were many days where he could not walk at all, or he didn't feel like he could walk at all. He also indicated that he reclined and lied down throughout the day to relieve pain. So those are factors as well as what he said about his sitting ability in the hearing. I just wanted to make sure the court was aware of that. Thank you. Thank you very much, Mr. Bates. We'll come down and greet counsel, and then we'll go to the next case.
judges: Robert B. King, Dennis W. Shedd, Henry F. Floyd